## Richmond

NATIONWIDE MUTUAL INSURANCE COMPANY v. ALICE M. GENTRY,
SUBSTITUTE PLAINTIFF FOR SAM W. NATHAN, ADMINISTRATOR, ETC.

November 28, 1960.

Record No. 5137.

Present, All the Justices.

The opinion states the case.

*John F. Rixey* (*Rixey and Rixey,* on brief), for the plaintiff in error.

*Stanley E. Sacks* and *Herman A. Sacks* (*Sam W. Nathan; Sacks* and *Sacks,* on brief), for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Alice M. Gentry, herein called plaintiff, has obtained a verdict and judgment against Nationwide Mutual Insurance Company, herein called the company, in the sum of $14,093.52, based on a liability insurance policy issued by the company to William F. Gentry, Jr., against whom the plaintiff had previously obtained a judgment in the same amount. That judgment was obtained July 3, 1958, as damages for the death of the plaintiff's husband in the automobile collision below described. The principal question in the present case is whether the company was relieved of liability by reason of the alleged failure of William F. Gentry, Jr., herein referred to as Gentry, to comply with the cooperation clause of the insurance contract. A secondary question is whether the company waived its right to rely on that defense. The clause in the policy which the company contends that Gentry violated was this:

"The Insured shall cooperate with the Company and, upon the Company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. * *."

While this policy was in force Gentry had an automobile accident. On June 6, 1956, at about 5:30 a.m., the car being driven by him ran off the highway near Morgan City, Louisiana, and struck a post. Gentry, who was in the Navy, was then on his way to Norfolk, where he had been transferred. In the car with him were his father, who was asleep in the front seat; and his mother and his two small daughters, aged three and four, who were asleep in the back seat.

His father was thrown from the car and received injuries from which he soon died, and his death was the basis of the judgment obtained by the mother against Gentry and which she seeks to collect from the company in the present action. Gentry and his mother were also injured in the accident but the two children were not hurt.

A Louisiana State trooper promptly investigated the accident and talked to Gentry at the scene. He testified that Gentry then told him that he felt a lurch, went off the road, jerked back, lost control and started skidding; that he had been driving all day and all night and apparently fell asleep. The trooper filed his official report of the accident with the traffic authorities giving this explanation made by Gentry as to how the accident happened.

Gentry notified the agent of the company in Norfolk of the accident and next day, June 7, 1956, Mr. Hoey, an adjuster for the company, interviewed Gentry in the hotel at Morgan City and took from him a statement written by the adjuster, in which Gentry stated that he was driving 55-60 miles an hour when "Suddenly a dog ran into my path from my left. I cut toward the right shoulder to miss the dog. When I started to come back on the highway I lost control and slid sideways in a ditch on the left side of the highway. My car hit a neon sign post. I was knocked out a few moments. * * The State Patrol investigated." Gentry wrote at the bottom of the statement "I have read the three above pages and they are true," and signed it.

On the present trial Gentry testified that he and the adjuster discussed the accident; that he told the adjuster he must have fallen asleep, and that he had told the trooper that he must have fallen asleep; but he further told the adjuster that he did not want to put it in the record "or in black and white" that he had fallen asleep because he was afraid of getting into trouble with the State police in Louisiana. He said he knew from his experience in police work in the Navy and with the Virginia State police that people can get into trouble by admitting that they could have fallen asleep; that he discussed this with Mr. Hoey; that he did not know whether Hoey suggested it or he himself suggested it, but that both agreed that it would not be put in the statement that he had fallen asleep but that a dog had run across the road in front of him. Hoey said it did not make any difference to him.

Hoey testified in the present case. He was asked whether he

specifically remembered that Gentry said a dog ran across the road in front of his car. He replied, "If I put it in the statement, that is what he told me." But he said that if Gentry had told him he had fallen asleep he would have put it in the statement; that Gentry did not tell him that he had fallen asleep. He could not recall whether he asked Gentry about talking with the police officer, although it was in the written statement that the State police investigated. He had, he said, refreshed his memory by use of the original statement and had no independent recollection of his investigation or of anything else Gentry said to him at the time. He did not get an accident report from the police or traffic authorities, although in adjusting claims it was usual to do so, he said. He did not talk to the trooper.

The next representative of the company that Gentry saw was Mr. Minix, an adjuster for the company in New Orleans, where Gentry's father was taken and where he died. Gentry said Minix was in the funeral parlor when he got there in the late afternoon of June 8; that they discussed the possibility of settlement and next day he went with Minix to a government camp where his mother and children were, and there his mother signed releases of her claims on account of the accident. Minix testified that this conference was on June 9; that Hoey called him on June 7, advised him of the accident, saying that Gentry was an insured of the company and had dodged a dog and lost control of his vehicle. Gentry said that he and Minix did not discuss the details of the accident and Minix did not remember any specific incident that was discussed but said there was no conversation about Gentry's going to sleep.

Among the releases taken by Minix on that occasion was one from Gentry's mother, the plaintiff. That release was set aside in a separate trial in the original suit of the plaintiff against Gentry, and the latter was given credit for $906.48 in the judgment obtained in that action, being the amount paid for that release.

The trial which resulted in the judgment against Gentry was had on June 18, 1958. That case in both of its features, *i.e.*, the question of release and the question of liability, was defended by the company's attorneys, who sought and were denied an appeal to this court. There was affirmative evidence in the present trial that in the former case, as well as in this case, Gentry cooperated with the company and its attorneys at all times and in all respects save as to the false

statement about the dog running across the road, first made in the statement given to Hoey, the company's adjuster, the day after the accident, and adhered to by Gentry until June 11, 1958, as below referred to.

On May 1, 1958, Gentry gave a statement in writing to the company's attorneys which included this sentence: "My version of the facts of the accident is the same now that it was when I originally discussed the matter with the insurance adjuster for my insurance company."

He admitted on the present trial that on the trial with respect to the release held in March, 1958, he did not tell counsel that the dog story was not true.

On June 11, 1958, one week before the trial which resulted in the judgment in favor of the plaintiff, Gentry voluntarily went to the office of the attorneys and made a statement which was reduced to writing and signed by him in which he said: "For two years now I have been sticking to the same story concerning how the accident happened, but I now admit that that story is not true and that it was made up by me under the following circumstances and conditions:"

He then described his physical and mental state produced by the accident, his concern for his father and his fear of getting into trouble in Louisiana. He stated that when the police officer asked him about the accident he said that a dog had run across the road in front of him and that he gave this same version to his mother, his aunt, to the insurance adjuster, and to the company's attorneys. He said: "After living with this false story for two years I came to see John F. Rixey, my company's attorney, on June 11, 1958 and made a full disclosure of the true facts of the accident. There was no dog involved." He added that the reason he gave the previous false statement was because he was afraid he would get into trouble with the State police in Louisiana. Actually, he said, he could not tell whether he fell asleep or not, but he must have because one minute he was going along on the right side of the road and the next thing he knew he was on the left. He concluded: "No one else other than my mother knows the true set of facts. I told her for the first time on Sunday, June 8, but no one but her had been told the true facts prior to my conference with John F. Rixey on June 11, 1958."

Reprehensible as this pattern of conduct was, if the company,

through its adjuster Hoey, was told the true facts by Gentry on the day of the accident, and agreed to substituting the false story about the dog, saying that it made no difference, as Gentry testified, it cannot now avail itself of that occurrence as a breach of the co-operation clause of the contract. The court correctly instructed the jury that if Gentry told Hoey the true facts concerning the accident, then the fact that the written statement prepared by Hoey and signed by Gentry contained an untrue version was not a failure to cooperate.

Gentry testified that he told Hoey he fell asleep and lost control of the car. The State trooper testified that Gentry told him the same thing. Hoey said he had no recollection of what Gentry said to him independently of the written statement. Had he done what he said was the usual thing, he would have inquired from the investigating trooper and learned that Gentry had told the trooper that he had fallen asleep. The whole matter was fully explored before the jury and the trial judge. At the request of the company the court instructed the jury that they were the sole judges of the credibility of the evidence and the witnesses and should disregard any testimony they believed to be improbable or untrue. The jury believed Gentry and the trial court refused to disturb their verdict. We cannot say that his testimony was incredible. The extent to which the contradictions and inconsistencies in his testimony affected its weight, and his purposes and motives, were questions for the jury to decide and we cannot properly disturb their verdict, bearing as it does the approval of the trial court. *Equitable Life Assur. Soc.* v. *Kitts*, 109 Va. 105, 106-7, 63 S. E. 455, 456; *Bristow* v. *Brauer*, 175 Va. 118, 122-3, 7 S. E. 2d 93, 94-5; *Bell* v. *Kenney*, 181 Va. 24, 30, 23 S. E. 2d 781, 783; *Simpson* v. *Commonwealth*, 199 Va. 549, 558, 100 S. E. 2d 701, 707.

The court instructed the jury, without objection, that the only question in this case was whether Gentry cooperated according to the terms of the policy, and that unless the company proved by a preponderance of the evidence that he did not do so, then the plaintiff was entitled to recover. However, at the instance of the plaintiff the court submitted to the jury the question of whether, if they found that Gentry had failed to cooperate, the company had waived the breach. The instruction given on this point told the jury that if they believed that the company's attorneys knew of such failure before the original case was tried, yet participated in the trials of

that case, attempted to appeal the judgment recovered therein and then originally appeared for Gentry in the present action, then there was a waiver of the breach unless the company reserved its right so to act and still deny liability. The facts stated in the instruction were undisputed.

To support its claimed reservation, the company offered a writing dated June 18, 1958, signed by it by its attorneys and by Gentry, stating that it was thereby stipulated and agreed by the parties that any action taken by the company in investigating, adjusting or defending any claim or litigation growing out of the accident "shall not be construed as a waiver of the said insurance company's right to deny liability under any policy or policies issued to William F. Gentry, Jr.," or "be considered a waiver of the assured's rights under said policy or policies."

June 18, 1958, the date of this writing, was one week after the date that Gentry told the company's counsel that the statement about the dog was false. June 18, 1958, was also the day on which the judgment case was tried. The evidence does not indicate at what time during that day the paper was executed, whether before the trial began, during its progress, or after it was concluded. Gentry admitted his signature to the writing but testified that he did not remember signing it or seeing it before, and that it was not explained to him; that the company's attorney did not tell him at any time that he would defend him but if the company lost the case it would not pay the judgment, and that he did not understand that to be the situation. There was no contradiction of this testimony and after the present action was brought the company's attorneys appeared and filed an answer for Gentry. On September 7, 1959, five months after the present action was begun, the company's attorney wrote plaintiff's counsel that he would petition the court for leave to withdraw as Gentry's counsel and that permission was granted by order of February 12, 1959. Gentry testified that the letter was the first notice he had that the company's attorneys were not going to protect him any more.

The court submitted to the jury the question of whether under the evidence the company had waived the alleged breach of the cooperation provision of the policy, and instructed them that in order for the company to rely on the alleged non-waiver agreement the burden was on it to prove that it was executed by Gentry a

reasonable time before the commencement of the trial on June 18, 1958, with full knowledge of the contents of that agreement. Under the evidence in the case the giving of this instruction was not error.

When a liability insurer has knowledge of a breach by the insured of the terms of the policy and continues to defend the case without notice to the insured that it is reserving a right to deny ultimate liability, it is estopped afterwards to avoid liability on the ground of such breach. Such reservation of right must be communicated to the insured, must fairly inform him of the insurer's position, and notice thereof must be timely given. Its sufficiency is to be determined by the facts of the particular case. *Fentress* v. *Rutledge*, 140 Va. 685, 695-6, 125 S. E. 668, 671; *Cooper* v. *Insurance Company*, 199 Va. 908, 916, 103 S. E. 2d 210, 216; 29A Am. Jur., Insurance, §§ 1465, 1467, pp. 577, 579; Annotation, 38 A. L. R. 2d 1148, 1150, 1169-70.

Here the jury could conclude that the company, through its adjuster, had knowledge of the true facts on June 7, 1956, the day of the accident; that the usual inquiry from the police officer would have disclosed that the true facts were related to him by Gentry immediately following the accident; that Gentry told the true facts to the company's attorney on June 11, 1958, a week before the trial. The non-waiver agreement was executed on the day of the trial, at what stage of the trial the jury were not told. The jury could believe Gentry's evidence that it was not explained to him and that he did not know its purpose or effect. The jury had a right to conclude under the evidence that it was not an effective non-waiver.

■ The company further complains of the giving of five instructions for the plaintiff and the refusal of three offered by it. There was no error in these rulings and only the following need be further noticed:

Instruction P-3 told the jury that failure to cooperate must be in some substantial and material respect, and in determining whether the alleged failure was in fact substantial and material the jury could consider whether the company was prejudiced thereby. It was in keeping with our holdings in *State Farm Ins. Co.* v. *Arghyris*, 189 Va. 913, 55 S. E. 2d 16; *Shipp* v. *Connecticut Indem. Co.*, 194 Va. 249, 72 S. E. 2d 343; and *Cooper* v. *Insurance Co., supra.*

Instruction D-4 refused to the company would have told the jury that if they believed from the evidence that Gentry intentionally

and willfully falsified the true, material and substantial facts concerning the accident to the representatives of the company, they should find for the company. It was a finding instruction which omitted any reference to a waiver. Also the court gave for the company an instruction telling them that if Gentry failed to cooperate the company was not liable and that cooperation means aid and assistance and requires that the facts should be fairly, fully and accurately disclosed; and another which instructed the jury that if they believed from the preponderance of the evidence that there had been a breach of the cooperation clause, the company was relieved of any further liability regardless of whether it was prejudiced thereby. There was no error in refusing D-4.

The company's final assignment was to the admission of certain evidence which involved no reversible error and was not of sufficient significance to require discussion.

The judgment below is

*Affirmed.*