Gertrude Sutphin SOUTHERN

v.

LUMBERMENS MUTUAL CASUALTY CO., Harleysville Mutual Casualty Co., State Farm Mutual Automobile Insurance Company and Ray Dalton.

Civ. A. No. 1268.

United States District Court
W. D. Virginia,
Roanoke Division.

Sept. 1, 1964.

Alton I. Crowell, Crowell, Deeds & Nuckols, Pulaski, Va., for plaintiff.

Philip M. Sadler, of Gilmer, Harman & Sadler, Pulaski, Va., for defendant Lumbermens Mut. Cas. Co.

Richard C. Rakes, of Gentry, Locke & Rakes, Roanoke, Va., for defendant Harleysville Mut. Cas. Co.

Stuart B. Campbell, Jr., of Campbell & Campbell, Wytheville, Va., for defendant State Farm Mut. Auto. Ins. Co.

John B. Spiers, Jr., of Spiers & Spiers, Radford, Va., for defendant Ray Dalton.

MICHIE, District Judge.

The plaintiff, hereinafter called "Mrs. Southern", was injured in an automobile accident in a collision between a car in which she was riding as a passenger owned by one Ray Dalton, a son of one William Matthew Dalton, and a truck owned by Walter E. Crigger but at the time driven by Franklin Duane Crigger as his agent. She brought suit against both Daltons and both Criggers. At the conclusion of the plaintiff's case the court struck the evidence as far as William Matthew Dalton was concerned and dismissed him from the case. Mrs. Southern was awarded a judgment in the sum of $25,000 against Ray Dalton, Walter E. Crigger and Franklin D. Crigger. Harleysville Mutual Casualty Company, Mrs. Southern's insurer, under the Virginia Uninsured Motorist Act, in its own right and on behalf of Ray Dalton, applied to the Supreme Court of Appeals of Virginia for a writ of error to the judgment but the writ was denied, the effect of which was to affirm the judgment of the Circuit Court of Pulaski County.

In addition to the Harleysville policy issued to Mrs. Southern, State Farm Mutual Automobile Insurance Company had issued to William Matthew Dalton a policy of liability insurance and Lumbermens Mutual Casualty Company had issued to the Criggers a policy of liability insurance with coverage in the amounts of $50,000/$100,000.

When the accident was investigated, the state trooper investigating it was

allowed to believe that William Matthew Dalton was the operator of the Dalton vehicle involved. The statement of facts agreed upon by the parties goes into some detail as to the steps taken by the Daltons to deceive the investigator and others as to this matter and the ultimate discovery of the truth as finally admitted by all concerned. I do not feel it necessary to go into any detail with respect to this as I do not believe that the attempt to deceive has any effect on the question of final liability in this case.

Mrs. Southern brought this suit against the three insurance companies above named to establish their respective liability, if any, for the payment of the judgment for $25,000 which had been awarded her.

Subsequent to the commencement of this suit, pursuant to order entered herein on December 10, 1962, Lumbermens Mutual Casualty Company paid to Mrs. Southern the full amount of the judgment rendered in her behalf against the Criggers and Ray Dalton together with interest and costs so that Mrs. Southern no longer has any personal interest in this litigation but it is now strictly between Lumbermens, which has paid the judgment, and Harleysville and State Farm, from whom Lumbermens hopes to collect. At a pretrial conference on the case, counsel agreed that there were three preliminary issues to be resolved as follows:

"a. Whether the question of agency has been finally determined by the Circuit Court of Pulaski County;

"b. Was Ray Dalton's use of his automobile on the date of the accident such a use as to be a 'temporary substitute' vehicle within the meaning of State Farm's policy and thereby qualify Ray Dalton as an additional insured under the policy?

"c. Whether or not Ray Dalton would be afforded coverage under Matthew Dalton's policy because of the relationship between Ray Dalton and Matthew Dalton at the time of the accident."

I will take these three questions up in the order in which they are stated above.

I

Whether the question of agency as between William M. Dalton and Ray Dalton has been finally determined by the judgment of the Circuit Court of Pulaski County, dismissing W. M. Dalton from the case at the conclusion of the plaintiff's evidence.

The memoranda submitted by counsel on this issue treat it as if it were a question of whether the rule of *res adjudicata* applies.

As noted in Burks Pleading and Practice § 357 (4th ed. 1952) at p. 674:

"Much confusion of thought and expression has resulted from the failure to observe the distinction between the effect of a former judgment where it is relied upon in a second suit involving the same cause of action, and where the prior judgment is invoked in a second suit upon a different claim or cause of action."

The prior action in the state court was one of tort wherein the defendants were sought to be made liable for damages. The action in the case at bar is one in the nature of a declaratory judgment wherein the question of insurance coverage is sought to be determined. It would seem, then, that the determination of the effect in this case of the previous litigation of the question of agency between father and son would come under the rule of collateral estoppel by judgment rather than *res adjudicata*. Burks, supra, quotes later from Cromwell v. County of Sac, (Iowa), 94 U.S. 351, 24 L.Ed. 195:

" * * * [t]here is a difference between a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same

parties upon a different claim or cause of action. In the former case the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding the parties and those in privity with them, not only as to every matter which was offered and received to sustain or defend the demand, but as to any other admissible matter which might have been offered for that purpose * * *. But where the second action between the same parties is upon a *different* claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." (Emphasis supplied.)

In the case at bar the question of agency or respondeat superior has been before the court in the prior state court suit. William Matthew Dalton had testified as to his relationship with his son, Ray Dalton, with respect to the circumstances surrounding the accident. See pages 216–222 of the transcript. The state court, in striking the evidence as to William Matthew Dalton's liability, necessarily found that there was no agency or respondeat superior relationship between father and son. Since that issue was determined and the finding was in favor of that defendant, the parties are estopped from relitigating it again.

As to the rule that the second suit must be between (among) "the same parties or their privies", the insurers of the parties in the first suit were, by the terms of the insurance contracts, obligated to defend and did defend the insureds thus coming precisely under the meaning of "privies." Aetna Life Ins. Co. v. Maxwell, 89 F.2d 988 (4th Cir. 1937) at p. 991 held:

"The insurance company, having been notified of the suit against the physician and having participated in the defense of the suit, at least to a limited extent, was indeed bound by the judgment upon the issues at stake therein and estopped to contest the validity thereof. When a person is responsible over to another, either by way of operation of law or by *express contract of insurance,* and is duly notified of the pendency of a suit and requested to assume the defense, he is no longer regarded as a stranger because he has the *right to appear and defend* the action, and the judgment, if obtained without fraud or collusion, will be conclusive against him whether he has appeared or not." (Emphasis supplied.)

The court found in favor of W. M. Dalton at the conclusion of the plaintiff's evidence. This finding necessarily is equivalent to an express finding that Ray Dalton was not W. M. Dalton's agent at the time of the accident. For if he had been, W. M. Dalton could not have been dismissed and the verdict should have been against both Daltons. And this clearly relieves W. M. Dalton's insurer from any liability on the agency or respondeat superior theory.

Both Burks, supra, and Michie's Jurisprudence, Former Adjudication § 17, note the general rule in Virginia that in order for a former adjudication to constitute an estoppel, the estoppel must be mutual. Both litigants must be alike concluded. Michie's supra, states "the estoppel must be mutual and such as would conclude the party pleading the same if the judgment had been adverse to him." State Farm is pleading the estoppel and if judgment had been for Mrs. Southern and against W. M. Dalton, State Farm would likewise be estopped from relitigating the issue of agency in a subsequent proceeding. Since the judgment of the state court was adverse to Mrs. Southern with respect to W. M. Dalton, she is precluded from recovering from him and, of course, Harleysville is also, since its rights only arise through subrogation to her rights. Nor can Lumbermens relitigate the issue since the jury finding against its assured binds it.

Thus where the issue of agency or respondeat superior has actually been litigated and determined in a prior action between the same parties or their privies, as in this case, the estoppel is mutual and these parties are estopped from relitigating the issue again.

## II

Was Ray Dalton's use of his automobile on the date of the accident such a use as to be a "temporary substitute" vehicle within the meaning of State Farm's policy and thereby qualify Ray Dalton as an additional insured under the policy?

William Matthew Dalton was in the practice of driving to work each day in his car and taking with him certain passengers who paid him for the service. Among his regular passengers was his son who was a resident of his household. On September 1, 1959 William Matthew Dalton's car failed to start and he suggested that his son should drive the son's own car to work transporting the father and the passengers to the place of their employment.[1] While the son was stopped to pick up the last passenger, his automobile was involved in a collision with a truck. Mrs. Southern, a passenger in Ray Dalton's car, was injured and brought suit in the Pulaski County Circuit Court.

As a result of the judgment rendered against the joint tortfeasors in the state court and the claim of Lumbermens Insurance Company, insurer of the Criggers, that it owes only half of the judgment, the question has been raised as to whether the "substitute automobile" clause in W. M. Dalton's policy provided coverage for Ray Dalton. If the car used on September 1, 1959 belonging to Ray Dalton can be considered a substitute automobile for the father's car described in the policy, then any driver under the conditions of the policy's omnibus driver clause would be covered. That clause is as follows:

"Temporary Substitute Automobile. Under coverages A, B and division 1 of coverage C, an automobile not owned by the named insured or his spouse if a resident of the same household, while temporarily used as a substitute for the described automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction."

This is a standard insurance contract clause interpreted many times by the courts. See 34 A.L.R.2d 933–951.

It seems clear from the stipulated facts that W. M. Dalton's automobile was withdrawn from normal use on September 1, 1959. It would normally have been used to transport the owner and his passengers to work on that day. The facts show that the car would not start and was subsequently taken to a garage for repairs to return it to running condition. Thus it would seem that a car used by W. M. Dalton in place of his own would become a temporary substitute within the meaning of the policy. See 7 Am.Jur.2d, Automobile Insurance §§ 103–104 (1963).

The real question here is whether W. M. Dalton was *using* his son's car in place of his own. The stipulated facts reveal that W. M. Dalton "suggested" to his son that the son would "have to take his car to work and pick up these passengers." As indicated above, there is no evidence as to whether or not the passengers were to pay W. M. Dalton for the trip, which would have indicated that the car was being "temporarily used as a substitute" or that they were to pay Ray Dalton or no one, either of which latter alternatives would have indicated that it was not a substitute car.

I have been unable to find authority closely in point. A case somewhat similar to this is Tanner v. Pennsylvania Threshermen & F. M. C. Ins. Co., 226 F.2d 498

1. The stipulation is silent as to whether there was or was not any understanding that the passengers on that day would pay the father, as they did when driven in his car, or the son or no one.

(6th Cir. 1955). In Tanner the facts were as follows. Two brothers were owners-operators of separate restaurants. Brother A's car was withdrawn from normal use for repairs. Brother A borrowed Brother B's car temporarily. On the same day A requested B to perform an errand for A using the borrowed car that actually belonged to B. B proceeded to carry out the request and in the process was involved in an accident. Suit was brought against A's insurer on the theory that B's car was covered by A's policy under the temporary substitute automobile provision. The test of what is a temporary substitute auto used by the district judge and approved by the Court of Appeals is:

> "He [the district judge] construed the word 'substitute car' to mean a car which was in the possession or under the control of the insured to the same extent and effect as the disabled car of the insured would have been except for its disablement." 226 F.2d p. 500.

In applying the test to the Tanner case it was found that the car B was driving (although his own) for Brother A was not under the control or in the possession of the insured Brother A. The court said that the use of the car was in "the nature of a friendly or brotherly accommodation." [2] Since it was not in the possession and under the control of A, the insured, it was not a substitute auto within the meaning of the policy.

▮ Applying the same test to the facts of the case at bar, the result would be the same—and even more clearly so. Although W. M. Dalton was riding in the car with son Ray, it is difficult to see how he would be in the possession and in control of Ray's personally owned and driven car to the same extent as he would have been had he been driving his own car. It would seem that the language in Tanner would apply here. Ray's use of his own car would be in "the nature of a friendly or brotherly [filial] accommodation." [3] Therefore Ray Dalton's car as used by him on September 1, 1959 can not be considered as a temporary substitute automobile within the meaning of W. M. Dalton's insurance contract with State Farm.

Although there are cases which imply that simple permission of the insured to another to operate a car temporarily substituted for the named vehicle would constitute sufficient grounds for the car to be covered under the substitute provision, none of them are substantially similar to the facts in the case at hand. See U. S. Fidelity and Guaranty Co. v. Grundeen, 138 F.Supp. 498 (N.D.N.D. 1956), aff'd 238 F.2d 750 (8th Cir.) and also Schevling v. Johnson, 122 F.Supp. 87 (D.Conn.1953), aff'd 213 F.2d 959 (2d Cir. 1954). But Tanner, supra, is factually much closer to the case at hand.

### III

Whether or not Ray Dalton would be afforded coverage under Matthew Dalton's policy because of the relationship between Ray Dalton and Matthew Dalton at the time of the accident.

▮ Counsel have not referred to any provision in the policy which seems so to provide and I have been unable to find any. The question must therefore be answered in the negative.

An order will be entered accordingly.

2. B had come to A's restaurant to help A as the restaurant was "busy" that day. A asked B to go to B's restaurant to get some additional meat for use in A's restaurant. The brothers were used to accommodating each other in many ways including the performing of services for each other involving the use of automobiles.

3. The facts reveal that Ray had driven the father's car on some occasions, including trips to work. The very nature of filial and paternal relationships encourage such accommodations. A contrary behavior pattern would be, I think, the exception.